AO 91 (REV.5/85) Criminal Complaint

AUSA Halley B. Guren (312) 353-5300

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**FILED**

JUL 2 2 2011

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

UNITED STATES OF AMERICA

v.

**CRIMINAL COMPLAINT**

FABRIEAL DELANEY,
also known as "Face"

CASE NUMBER:

# 11 CR 0497

**MAGISTRATE JUDGE COLE**

I, the undersigned complainant, being duly sworn on oath, state that the following is true and correct to the best of my knowledge and belief: On or about July 21 and 22, 2011, at Tinley Park, Illinois, in the Northern District of Illinois, Eastern Division, and elsewhere, FABRIEAL DELANEY, also known as "Face," defendant herein:

knowingly transported Victim 1, an individual who had not yet attained the age of 18 years, in interstate commerce, from the State of Michigan to the State of Illinois, with the intent that the Victim 1 engage in prostitution;

in violation of Title 18, United States Code, Section 2423(a). I further state that I am a Special Agent with the Federal Bureau of Investigation, and that this complaint is based on the facts contained in the Affidavit which is attached hereto and incorporated herein.

Signature of Complainant
CARRIE LANDAU
Special Agent, Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

July 22, 2011
Date

at Chicago, Illinois
City and State

Jeffrey Cole, U.S. Magistrate Judge
Name & Title of Judicial Officer

Signature of Judicial Officer

UNITED STATES DISTRICT COURT     )
                                           )    ss

NORTHERN DISTRICT OF ILLINOIS     )

## AFFIDAVIT

I, Carrie Landau, being duly sworn, state as follows:

1.     I am a Special Agent with the Federal Bureau of Investigation (FBI) and have been a Special Agent for approximately eight years. My duties include investigating various violent crimes, including sex trafficking of minors and sex trafficking by force, fraud, and coercion, in violations of 18 U.S.C. §§ 1591(a), 2421, and 2423.

2.     This affidavit is submitted in support of a criminal complaint alleging that FABRIEAL DELANEY, also known as "Face," has violated Title 18, United States Code, Section 2423(a) Because this affidavit is being submitted for the limited purpose of establishing probable cause in support of a criminal complaint charging DELANEY for engaging in sex trafficking of a minor, I have not included each and every fact known to me concerning this investigation. I have set forth only the facts that I believe are necessary to establish probable cause to believe that the defendant committed the offense alleged in the complaint.

3.     This affidavit is based on my personal knowledge, information provided to me by other law enforcement officers, recordings, documents, computer evidence, and interviews with witnesses.

1

## FACTS SUPPORTING THE COMPLAINT

### I.    Brief Summary of Investigation

4.    Based on evidence obtained from sources including a September 29, 2010, traffic stop by Illinois State Police ("ISP") troopers, Facebook and MySpace pages, internet advertisements, telephone and hotel records, recordings from the Will County Jail, consensual recordings with a cooperating witness, surveillance, and interviews, this investigation has revealed that on or about July 21 and 22, 2011, DELANEY knowingly transported by car Victim 1, who was under the age of 18, from Michigan to Tinley Park, Illinois, with the intent for Victim 1 to engage in prostitution.

### II.   Background of the Investigation

#### A.    Illinois State Trooper's September 29, 2010 Traffic Stop of DELANEY

5.    According to information from police reports and conversations with ISP, on or about September 29, 2010, an ISP trooper conducted a traffic stop of a Gold Kia, Illinois registration 4677096, at the junction of Interstate 55 and Route 52, based on the driver's reckless driving and the fact that the Kia had been reported as stolen.   In conducting the traffic stop, the ISP trooper found three female passengers in the Kia, in addition to the driver.   The driver of the Kia eventually identified himself to the ISP trooper as FABRIEAL DELANEY, which was corroborated by DELANEY's fingerprints.

6.    ISP troopers transported DELANEY and the three females to a police station for processing.   The three females identified themselves as Individual A, Individual B,

2

and Victim 1, and each agreed to be interviewed. Victim 1 and Individual B identified themselves as sisters. Individual A and Individual B were adult females.

7. During the interview with Victim 1, Victim 1 told ISP troopers that she was 16 years old with a date of birth in November 1993. A copy of Victim 1's birth certificate, later obtained by FBI agents, confirmed Victim 1's date of birth. According to Victim 1, Individual A had contacted Victim 1 through an online social networking site, Facebook, where Victim 1 had a profile. [1] Victim 1 advised ISP troopers that Individual A had driven Victim 1 from Michigan to Joliet, Illinois and, for approximately one to two weeks, Victim 1 had worked for "Blue Flame Entertainment," which was owned by DELANEY and Individual A, engaging in sexual acts in exchange for money. Victim 1 advised that she had given a portion of the money for these sexual acts to DELANEY and Individual A. Based on the Facebook profile name for Victim 1, Will County Jail recordings, and an interview with DELANEY, described in footnote 7, Victim 1 used the nickname "CeCe."

8. During Individual A's interview with ISP troopers, Individual A provided ISP troopers with written consent to search a Comfort Inn hotel room in Joliet, Illinois, where Individual A told ISP troopers DELANEY and Individual A had been staying. That same day, on or about September 29, 2010, ISP special agents searched the Comfort

---

[1] Based on my training and experience and the training and experience of other law enforcement agents with whom I have consulted, I know that Facebook and MySpace own and operate free-access social networking websites. Facebook and MySpace allow their users to establish accounts with Facebook and MySpace, respectively, and users can then use their accounts to share "status updates," written news, photographs, videos, and other information with other Facebook and MySpace users, respectively, and sometimes with the general public. Victim 1's Facebook profile listed Victim 1's age incorrectly as 17. Victim 1 claimed to ISP troopers that DELANEY and Individual A believed that Victim 1 was 18.

Inn hotel room. During the search of the Comfort Inn hotel room, the ISP special agents reported seeing unused condoms and bloody soiled bed sheets. The ISP special agents recovered a business card for "Blue Flame Entertainment." Records from the Comfort Inn in Joliet, Illinois, showed that an individual using the name "Fabrieal Delaney" paid in cash for a room at the Comfort Inn on the following dates (1) September 13, 2010, to September 15, 2010, (2) September 20, 2010, to September 23, 2010, and (3) September 26, 2010, to September 29, 2010, the day of the search. An FBI agent later observed at the Comfort Inn in Joliet, Illinois, where DELANEY had paid for a hotel room during the relevant period, a white and blue checkered wall in the hot tub area for the hotel. In addition, records from a Red Roof Inn in Joliet, Illinois, showed that an individual using the name "Fabrieal Delaney" paid in cash for a hotel room at the Red Roof Inn from on the following dates: (1) August 21, 2010, to August 26, 2010, (2) September 4, 2010, to September 10, 2010, (3) September 15, 2010, to September 21, 2010.

9.      During the interview with Individual B, Individual B provided ISP troopers with consent to access Individual B's Facebook profile. Through her own Facebook account, Individual B was able to identify and access profiles which Individual B identified as belonging to DELANEY, Individual A, and Victim 1. Each Facebook profile had a variation of the identified user's name or known nickname and a profile photograph, among other photographs, of the identified profile user. An ISP trooper viewed and printed a profile for Victim 1, which incorrectly listed Victim 1's birthday as being in November 1992, which would have made Victim 1 17 years old at the time of the traffic

4

stop. Victim 1's profile photograph was a photograph of Victim 1 and Individual A. In addition, Victim 1 was "friends" with DELANEY and Individual A via her Facebook profile. Victim 1 had listed Individual A as her "sibling" on her profile along with her actual sister, Individual B.

10. An ISP trooper viewed and printed screen shots of Individual A's Facebook profile, which included the following information. The "Employers" section listed "Blue Flame Entertainment." The "Bio" section stated "Blue Flame Ent. is a world wide ADULT entertainment service . . .It was found by Mr. and Mrs. Delaney in '09." The Bio section also stated that Blue Flame Entertainment "truly [sic] believe[s] that every single women [sic] . . . has the potential to work in the adult industry." Individual A identified herself as "MRS. Fire Flame (CEO)" and DELANEY as "Face~~(OWNER)."[2] The Bio section listed telephone numbers for Blue Flame Entertainment, one of which ended in "6895" and one which ended in "6680." According to Sprint records, the telephone number ending in "6895" was subscribed to the first name of Individual A and the last name "Delaney," and the telephone number ending in "6680" was subscribed to DELANEY.

11. FBI agents conducting searches for online advertisements for commercial sex found the telephone number ending in "6895" listed on advertisements under the "escort," "adult," or "erotic services" sections of internet posting websites, including

---

[2] Based on recordings, interviews, and Facebook pages, FBI agents learned that "Face" is a nickname used by DELANEY.

backpage.com, cheatingboard.com, cityvibe.com, myprovider.com, and hotescort.com, among others. The language used in the advertisements, such as use of the abbreviation "GFE" for girlfriend experience indicates that these internet advertisements were for commercial sex acts. The internet advertisements featured photographs of females, some of which FBI agents recognized to be Individual A and Victim 1.

12.     An ISP trooper also viewed and printed screen shots of DELANEY's Facebook profile, under the user name "FaceFace Blueflame Delaney," which Individual B accessed through her own Facebook account. DELANEY's Facebook profile listed his employer as "BLUE FLAME ENT." In addition, an ISP trooper viewed and printed a screen shot of a posting on DELANEY's Facebook profile from on or about September 16, 2010 (thirteen days before the traffic stop by ISP), which stated, "goin to Michigan to pick up a new employee. lets get it. Blue flame hoe1."

13.     Ultimately, ISP trooper issued DELANEY complaints for possession of a stolen vehicle and obstruction of justice, and citations for driving with a suspended license and the illegal transportation of alcohol. ISP troopers gave both Victim 1 and Individual B citations for consumption of alcohol by a minor, and ISP troopers issued no citations to Individual A.

14.     Before towing and impounding the gold Kia, ISP officers conducted a search of the Kia. ISP officers recovered a Compaq laptop computer from the Kia.

**B.      Evidence From Compaq Computer, Facebook, and MySpace**

6

15. On or about October 1, 2010, Will County Circuit Judge Richard Schoenstedt issued a warrant to search the seized Compaq. ISP troopers maintained custody of the Compaq but did not execute the state search warrant.

16. On or about December 3, 2010, U.S. Magistrate Judge Jeffrey Cole issued a warrant to search (1) the seized Compaq; (2) the Facebook profile for "FaceFace Blueflame Delaney; (3) the Facebook profile currently under the first name of Individual A, followed by "no Regrets Delaney" and previously under Individual A's name, and the first name of Individual A followed by "Blue Flameent Delaney"; (4) the Facebook profile for "Blue Flame Entertainment"; (5) the Facebook profile for Victim 1 under the first name "CeCe"; (6) the MySpace profile in the name of "Fire," which the investigation had shown was connected to Individual A; and (7) the MySpace profile connected to Victim 1.

17. On or about November 2, 2010, FBI agents also obtained consent from Victim 1 to access and then accessed and printed screen captures of certain Facebook and MySpace pages for the profiles of Victim 1, DELANEY, and Individual A.[3]

18. During the search of the Compaq, FBI agents recovered photographs of DELANEY, Individual A, and Victim 1.[4] Several photographs showed Victim 1 in

---

[3] When Victim 1 reviewed DELANEY's and Individual A's Facebook profiles on or about November 2, 2011, Victim 1 stated that there were some changes to DELANEY's and Individual A's profiles since September 29, 2010, the day that ISP troopers arrested DELANEY.

[4] FBI agents recognized photographs of Victim 1 from FBI agents' interviews with Victim 1. FBI agents recognized photographs of DELANEY and Individual A by comparing the photographs to driver's license records. FBI agents further recognized photographs of DELANEY and Individual A from photographs on their Facebook and MySpace profiles and the seized Compaq, which include photographs that Victim 1 also identified as DELANEY and Individual A.

7

sexually explicit poses, including poses of Victim 1 topless, showing her buttocks, and touching her genital area. There was one photograph of Victim 1 receiving oral sex from Individual A and one photograph where Individual A had her finger touching Victim 1's partially-clothed genitals and her mouth near Victim 1's partially-clothed genitals. One photograph showed Victim 1 straddling Individual A with Individual A's hand underneath Victim 1's bikini bottom and touching Victim 1's buttocks while in a hot tub with a white and blue checkered background. Two photographs showed Individual A with her mouth close to Victim 1's bare nipple and Individual A's hand on Victim 1's breast while in the hot tub with the white and blue checkered background. In an FBI interview with Victim 1 on or about February 28, 2011, Victim 1 identified Individual A, DELANEY, and herself in all the photographs described above. Several of the photographs of Victim 1 recovered from the Compaq appeared identical to photographs posted in online advertisements for commercial sex acts. One of the photographs, which appeared similar to a photograph of Victim 1 used in an online sex trafficking advertisement had the words "Diamond" and "Blue Flame Ent" and a heart superimposed on the photograph. FBI agents located internet advertisements for commercial sex acts featuring Victim 1 and using the nickname "Diamond." Hewlett Packard records showed that the Compaq was registered with Hewlett Packard under the the first name of Individual A and the last name "Delaney," and the registrant had provided the telephone number ending in "6895."

19.    A review of DELANEY's Facebook profile messages showed several references to pimping and sex trafficking sent before September 2010. On or about May

26, 2010, a message sent from DELANEY's Facebook profile to another user stated, "man foo i been thru alot of shit since i moved to the chi . long story short i was trappin now im pimpin lol 4real tho." Based on the investigation, I understand "the chi" to refer to Chicago. On or about May 26, 2010, a message sent from DELANEY's Facebook profile to a user stated, "hold. i moved ouuta the town, im n Joliet now   .i was trying to do the square life, but it wasn't workin 4 m3 . . . back flamein.  krazy tho."  DELANEY stated in a later message to the same user that, ". . . man i hated bien in the town and not havin the money im use too .  so the game called me back."  Based on my training and experience, discussions with other FBI agents, and the context of this investigation, I understand "the game" to refer to sex trafficking.

20.    On or about September 1, 2010, a message sent from DELANEY's Facebook profile was sent to a female user in what appears to be a recruitment for sex trafficking, stating "call me, I started my own bissness. U mite be interested.   500 a day or more.  [XXX-XXX]-6680."

21.    FBI agents viewed and printed a screen capture of a message on Victim 1's MySpace page that Individual A, under the nickname "Fire," had posted to Victim 1 on or about September 14, 2010. Based on FBI agents' investigation and review of online advertisements, FBI agents learned that Individual A used the nickname "Fire" and variations of the nickname "Fire Flame" in her online postings for commercial sex acts and on her Facebook profile.  In that message, Individual A stated that she would "actually love for u to come down here and see what I do I can tell that u have a lot of potential n can

9

check in a lot of money . . ."      Victim 1's MySpace profile incorrectly listed her age as

17.

22.      A review of Victim 1's Facebook profile showed that, on or about September

17, 2010, Victim 1 added "Faceface Blue Flame Delaney" as a friend.   In addition,

Facebook records showed that Victim 1 received a message from Individual A's profile on

or about September 17, 2010, in which Individual A stated "we see u miss DIAMOND

FLAME blue flame ent till da death."   On or about September 18, 2010, Victim 1 changed

her employment status in which she added Blue Flame Entertainment as her employer.

23.      A review of DELANEY's Facebook profile showed several photographs

posted September 20, 2010, of DELANEY holding cash fanned out with either another

male or with Individual A; of Victim 1 and Individual A each displaying cash fanned out;

and of DELANEY, Victim 1, and another male with DELANEY, who was holding cash

fanned out.

24.      Individual A's Facebook profile showed several photographs posted on or

about September 27, 2010, of DELANEY and DELANEY and Individual A in a hot tub

with a blue and white checkered background substantially similar to the white and blue

checkered wall observed by an FBI agent at the Comfort Inn in Joliet, Illinois.   This

background is the same background used in photographs of Victim 1 posted in online

advertisements for commercial sex acts.

25.     On or about September 28, 2010, a day before the ISP traffic stop, DELANEY sent a message from his Facebook account to a male stating, "In Joliet getn it in.  I told u bout me and my wife biz .blue flame ent . Escort biz."

26.     Also on or about September 28, 2010, Victim 1 sent a message to Individual B's Facebook profile, in which she stated "why me.?? oh yeah..CUZ IM DHA SHT BTCH..!!  BLUE FLAME ENT..WE OUT HERE GRINDIN LIKE SOME MUH FCKN SKATERSZ."  I believe the term "grind" and "grinding," refers to selling sex for money.

**C.     Internet Postings**

27.     In the course of the investigation, FBI agents found multiple advertisements for both Individual A and Victim 1 on internet websites.  The majority of these advertisements listed the telephone number ending in "6895," which Individual A had stated on her Facebook profile was the telephone number for Blue Flame Entertainment and was subscribed to Individual A's name.

28.     Advertisements with photographs of Victim 1 used phrases such as "GFE." I believe "GFE" is an abbreviation for "Girlfriend Experience," which is used in advertisements for commercial sex acts.

29.     FBI agents located on cityvibe.com an advertisement for commercial sex acts, posted on September 20, 2010, featuring photographs of Victim 1.  The subject of the internet posting read "G F E HAWAIIAN HOTTIE model type treat urslef 80."  One of the three images of Victim 1 showed Victim 1 clothed sitting on a motel bed; one showed Victim 1 completely nude and facing away from the camera in the shower.  Another

11

photograph of Victim 1 showed Victim 1 in transparent clothing. All three of these photographs were recovered during the search of the Compaq, and Victim 1 identified herself in the three photographs when interviewed by FBI agents. The posting listed the telephone number ending in "6895," listed on Individual A's Facebook page as the telephone number for Blue Flame Entertainment. Portions of the text in the advertisement stated "30 min- 125 kisses 60 min 200 kisses .outcall special 30 min- 200 kisses 60 min 375 kisses !" and "ask about my two girl show. Lets play." Based on my training and experience and discussions with other FBI agents, I understand the word "kisses" to be code for the cost of the sexual acts for a specified length of time; in other words, the advertisement was for $125 dollars for 30 minutes of commercial sex acts. I understand the word "outcall" to refer to a call where an individual meets a client for commercial sex acts at a location of the client's choosing and/or arrangement.

30. FBI agents located another advertisement featuring Victim 1 posted on or about September 26, 2010 on an online website, myproviderguide.com/escorts/kalamazoo.[5] The advertisement had a subject title of "Diamond~ G_F_E HAWAIIAN hotti .. model type 100 kiss specia 15min** HOT-19" and contained three photographs of Victim 1. I understand from my training and experience and discussions with other FBI agents the term GFE to be an abbreviation for "girlfriend experience," which refers to a prostitute kissing the client and acting as though

---

[5] Victim 1's mother advised law enforcement that, sometime before September 29, 2010, DELANEY and a black female picked up Victim 1 from the mother's house in Michigan, and Victim 1 told her mother that Victim 1 was going to Kalamazoo.

the two have a relationship. FBI agents further understand the reference to "100 kiss specia 15 min" and "HOT-19" to refer to $100 for 15 minutes with a 19 year old individual for commercial sex acts. In one of the images of Victim 1 in the advertisement, Victim 1 was posing topless, with her arm and hand covering her chest, partially in a hot tub and in front of a white and blue checkered wall. This white and blue checkered wall appears substantially similar to the white and blue checkered wall in a photograph on Individual A's Facebook profile of Individual A and DELANEY, posted on September 27, 2010 and the hot tub area of the Comfort Inn in Joliet, Illinois. Another image in the advertisement was of a young female appearing to be Victim 1 taken in transparent clothing, from behind, in a position in which Victim 1 is on her hands and knees. This photograph appears to be the same photograph. Victim 1 identified herself in the photograph.

31.    Another internet advertisement posted on September 28, 2010, on a website, backpage.com with the name "Mz. Fire Flame" in the subject, had a photograph of Individual A and Victim 1 embraced in a hot tub. The hot tub had the same white and blue checkered background in the photograph of Victim 1 as in paragraph 31 and the photographs of DELANEY and Individual A on Individual A's Facebook profile. The photograph was recovered during the search of the Compaq. The text of the advertisement started with listing the telephone number ending in "6895" and then stating "ASK ME ABOUT MY TWO GIRL SHOW." Backpage.com records showed that the individual posting the advertisement listed "blue flame" in the "user info" section related to the advertisement.

32. In one advertisement posted on October 6, 2010, on the internet site hotescorts.com, the text of the advertisement stated "DON'T 4GET TO ASK ME ABOUT MY TWO GIRL SHOW….(I also practice Domination and Fetish.)" One of the photographs on the advertisements was a photograph of both Individual A and Victim 1 in a bathtub together. The telephone number listed was the same number ending in "6895" used in the previous advertisements.

33. FBI agents also located approximately two internet postings advertising Victim 1 for commercial sex acts, using a telephone number starting with "269-788." Victim 1 had identified this telephone number as her own telephone number to ISP troopers, but Victim 1 later claimed to FBI agents in an interview that the telephone belonged to her sister, Individual B.[6] An internet advertisement posted on September 29, 2010, on backpage.com used in the subject the term "GFE." Portions of the advertisement's text stated, "ASK ME ABOUT ME & MY GIRL FRIENDS 2GIRL SHOW." The advertisement contained three photographs of Victim 1, two of which were described in paragraph 29. In one photograph, Victim 1 was wearing transparent clothing on a hotel bed, and in one photograph, Victim 1 was completely nude and facing away from the camera in the shower. Victim 1 also identified herself in these photographs. There is a fourth photograph of Victim 1 and Individual A embracing in the hot tub with

---

[6] When interviewed by ISP troopers, Individual B identified two different telephone numbers as belonging to Individual B. Individual B was not asked the user of the number beginning with "269-788."

the white and blue checkered background.   Backpage.com records listed the user name for the internet advertisement as "blue flame."

34.     FBI agents found another online advertisement for commercial sex acts with a photograph that FBI agents recognized as Victim 1 on a website, sipsap.com.   This advertisement's texts also used the term "GFE" and listed the telephone number used by Victim 1 that began with "269-788."

**D.     Recorded Jail Calls Between DELANEY and Individual A**

35.     While DELANEY was being held at the Will County Jail from approximately September 29, 2010, through approximately October 22, 2010, on charges filed by the state stemming from the traffic stop, DELANEY made multiple recorded calls to Individual A.   The recorded calls from the Will County Jail all contained a preamble alerting callers that the calls were being recorded.   In addition to recorded calls to Individual A, DELANEY attempted to make 5 calls between approximately September 30, 2010 and October 1, 2010 to the telephone number beginning with "269-788," which Victim 1 identified as her telephone number.   The following are partial summaries of the recorded calls between DELANEY and Individual A.   In many of the recorded calls, coded language was used to conceal the true nature of the telephone calls.   For some of the calls summarized below, I have placed in brackets my understanding of what is being said during recorded calls, based on the content and context of the conversations, the Facebook and MySpace profiles, internet postings, interviews, and my experience as a law enforcement officer and the experience of other law enforcement officers in this

15

investigation, including the experience of FBI agents, who listened to the recorded conversations. The identification of DELANEY's voice is based in part on the following: (1) the unique PIN number associated with DELANEY while in Will County Jail; (2) FBI agents' comparison between the voice on the recordings and DELANEY's voice during an interview with FBI agents on or about October 5, 2010; (3) Individual A's use of DELANEY's nickname "Face" to refer to DELANEY in the recorded calls; and (4) the content of the conversation in the context of the investigation. The identification of Individual A's voice in the Affidavit is based in part on the following: (1) the recorded calls were placed to telephone numbers ending in "6895" and "6680," which were subscribed in the first name of Individual A and the last name "Delaney," and DELANEY, respectively; (2) FBI agents' comparison between the voice on the recordings and Individual A's voice during an interview with FBI agents on or about July 21, 2011; (3) references in a recorded call to internet postings under nicknames that FBI agents learned through the investigation were associated with Individual A; (4) Individual A's use of her full name and a nickname "Livi," a nickname used by Individual A; and (5) the content of the recorded calls in the context of the investigation. Finally, the summaries below do not include all potentially criminal calls recorded at the Will County Jail, or all statements or topics covered during the course of the recorded calls. They do not represent finalized transcripts and may not represent the entire conversation that occurred between DELANEY and Individual A. The dates of the recorded calls are approximate.

16

36.     Specifically, in recorded calls from on or about October 2, 2010, through October 4, 2010, DELANEY and Individual A discussed at length Victim 1's involvement in commercial sex acts, the need to erase evidence that could be found in internet advertisements and DELANEY's and Individual A's Facebook profiles, and the evidence that could be found on the seized Compaq.  The recorded calls were from the number ending in "6680," subscribed to DELANEY and listed on Individual A's Facebook profile as a telephone number for Blue Flame Entertainment.

37.     For example, in a recorded call on or about October 2, 2010, between DELANEY in Will County Jail, DELANEY revealed his knowledge of Victim 1's minor status and Michigan residence, at times referring to Victim 1 as "CeCe," Victim 1's nickname.   Individual A stated to DELANEY, "Okay, but if I go down, then I'm gonna do the most time for, for what?   Because you already knew that this bitch was 16 years old!"  Individual A further stated that Individual B (Victim 1's sister) texted Individual A that "Face knew my mother fuckin' sister is 16 the whole mother fuckin' time."   Individual A also repeated to DELANEY that Victim 1 had stated that "even after he found out I was 16, he was still fuckin' me."   Individual A further told DELANEY that Victim 1 had said that DELANEY "already knew she was 16 but you was goin' along with it tellin' me . . . that um . . . that she, that she was 17 so that she could work . . ."   DELANEY stated, "Man that bitch better get out!"   [I believe DELANEY was referring to Victim 1.]   Individual A also advised DELANEY that Individual A "been tellin' em if y'all fine to come work cause y'all still owe me that 100 dollars or whatever and then [another male] trying to get 'em to

17

work and shit." Upon hearing that Victim 1 had not brought Individual A the owed $100, DELANEY stated, "I'm fuckin' them bitches up soon as I get out." DELANEY also stated that he knew "exactly where them hos reside."

38.     In the same telephone call, DELANEY also discussed the possible evidence against him with regard to charges he thought the state might bring against him. DELANEY told Individual A that, "they tryin' to charge me with pimpin'! You know what I'm sayin', but they ain't got nothing." [I believe DELANEY was referring to potential state pimping charges against him.] Individual A responded with, "Uh huh, I erased our Facebook" Individual A further stated that "I erased all the ads that was on her." [I believe that Individual A was informing DELANEY that Individual A had erased evidence of sex trafficking from DELANEY's and Individual A's Facebook profiles and internet advertisements.] Later in the telephone call, Individual A told DELANEY, "She already said that she ain't face nothin'. They had asked her…if that was her on, in them pictures. She said, no, that's not her in the pictures." [I believe Individual A was explaining that Victim 1 told Individual A that Victim 1 denied to law enforcement that it was Victim 1 in the photographs of Victim 1.] DELANEY responded, "They asked her that?" Individual confirmed, "Yeah!" DELANEY asked, "What pictures?" Individual A responded, "In the pictures on my Facebook!" DELANEY yelled at Individual A, "I told you don't put up that mother fuckin' pictures . . . that's what's in that mother fuckin' swimmin' pool." [I believe DELANEY was telling Individual A that DELANEY had told

18

Individual A not to post on Facebook the photographs of Individual A and Victim 1 the hot tub with the white and blue checkered background.]

39.     DELANEY also acknowledged ownership of the laptop, stating ". . . they they went before a judge who just fin' to get off, who fin' to retire Monday who don't give a fuck so he the one that serviced that bogus warrant to go through my laptop in the first place!"  In addition, DELANEY stated that, "They got a warrant to search the laptop. That mean they goin' through all that!   It's pictures of you and that bitch!"   [ I believe that DELANEY was referring to the warrant obtained by the state for his Compaq laptop and photographs of Victim 1 on his Compaq].

40.     In another recorded call on or about October 2, 2010, DELANEY and Individual A discussed erasing online advertisements for commercial sex acts for Victim 1. At one point, DELANEY asked Individual A, "Do you have a BP account . . . for that?"   [I believe that DELANEY was referring to backpage.com.]   Individual A replied that Individual A had one "not under D's name, not under her . . . under myself and I think uh, China Doll, . . . but the ones with her is erased."  [I believe that Individual A was stating that there was not a backpage.com account for "Diamond," a name used in internet advertisements for Victim 1 on backpage.com because Individual A erased Victim 1's advertisements.   I further believe that Individudal A was stating that Individual A had a backpage.com account for "China Doll," which was a name used by Individual A in internet postings for commercial sex acts found by FBI agents during internet searches.] DELANEY then asked "even though you did with the one picture with y'all when . . .

19

under the um ...two girls show at?"   [I believe DELANEY was asking if Individual A had erased internet advertisements containing a photograph of both Individual A and Victim 1 and the words "ask me about my two girl show."]

41.    Later in the telephone call, DELANEY asked Individual A, "Did you Google her number" to "make sure that nothing pops."   [I believe that DELANEY was asking Individual A to search using google.com for Victim 1's telephone number to see whether any internet advertisements for commercial sex acts appear in the search results.] Individual A replied "no" and asked DELANEY for the telephone number, starting to ask if it was "269-744."   DELANEY corrected Individual A that it was "788," but then instructed Individual A "don't say the rest just look in your telephone."   [I believe that DELANEY was providing Individual A with Victim 1's telephone number only in part, so as to conceal the telephone number from detection by law enforcement.]   Individual A asked DELANEY, "Who did her fucking Sipsap account?"   DELANEY responded, "What the fuck is that?"   [I believe that Individual A found the advertisement for commercial sex acts with Victim 1 on Sipsap.com listing the telephone number beginning with "269-788."]   Individual A answered, "It's another thing like CB . . ."   [I believe that "CB" is an abbreviation for cheatingboard.com, a type of website used to post internet advertisements for commercial sex acts.]

42.    In another telephone call on October 2, 2010, DELANEY advised Individual A, "Maybe even though we ain't got to, let her know when she turn 1-7, she's welcome back into the, you know what I'm sayin'?   [I believe that DELANEY was advising

20

Individual A to let Victim 1 think that she would be welcomed back to work for DELANEY and Individual A engaging in commercial sex acts when she turned 17.]

43.     In a recorded call on or about October 3, 2010, between DELANEY and Individual A, DELANEY stated that, "The only thing I'm worried about is the pictures of her that's that's in there as far as um you and her. . . . What if they try to hit me with some child pornography shit . . . That ain't even her, that [Individual B]. You know what I'm saying. You hear me." Later, Individual A asked, "So you want me to call the girls and tell 'em to a you know if anything is anything them P.I.Cs is um [Individual B's]?" DELANEY responded, "Yeah, call and let them know that them, that that. Call what's her name and let her know." [I believe that DELANEY was instructing Individual A, Individual B, and Victim 1 to all falsely tell law enforcement that the photographs of Victim 1 were Individual B, who had turned 18 several days before the ISP traffic stop.]

44.     In another recorded call on or about October 4, 2010, between DELANEY and Individual A, DELANEY asked, "Do you think I'm safe?" Individual A responded, "To be honest with you, yeah, because for the simple fact that J and C look just alike . . . so who could really say who is who." [I believe that "J" referred to Individual B, whose first name begins with "J" and "C" to refer to Victim 1, and that this statement was a continuation of DELANEY's intention to falsely tell law enforcement that the photographs were of Individual B and not of Victim 1.]

45.     In another recorded call on or about October 4, 2010, DELANEY discussed the false statements that Victim 1 could or did make to law enforcement. DELANEY

21

stated, "And then...and then, that's not, that's not prostitution! That's solicit-that's not prostitution. She's doin', they, they doin' that for mother fuckin'...um, for roses and kisses and hugs." Individual A responded, "Uh huh." [I believe DELANEY was referring to advertisements for commercial sex acts with Victim 1 and Individual A which used the code words "kisses" for dollars.]

      E.     **Victim 1's November and February 2010 Interviews with Law Enforcement**

    46.    During Victim 1's interview with ISP troopers, on or about September 29, 2010, Victim 1 provided the following information to ISP troopers. About one to two weeks before the traffic stop, Individual A drove Victim 1 to Joliet, Illinois, where DELANEY, Individual A, and Victim 1 stayed in a hotel for about four days. DELANEY and Individual A drove Victim 1 back to Michigan on the Saturday before the September 29, 2010 traffic stop (on or about September 26, 2010), dropping off Victim 1 at the house of Individual B's boyfriend. The next day, DELANEY and Individual A drove Victim 1 back to Joliet, Illinois, and the three of them stayed overnight at a Comfort Inn. Once in Joliet, Illinois, DELANEY asked Victim 1 to have sex with men in exchange for money as an employee of Blue Flame Entertainment. Victim 1 engaged in sexual acts with men in exchange for money, keeping some of the money for herself and giving some of the money to DELANEY and Individual A. If the payment for the commercial sex act was $100 for 15 minutes, Victim 1 kept $50 and gave $50 to DELANEY and Individual A. If the

payment for the commercial sex act was $150 for a half hour, Victim 1 kept $100 and gave $50 to DELANEY and Individual A.   If the payment for the commercial sex act was $250 for an hour, Victim 1 kept $175 and gave $75 to DELANEY and Individual A.   Victim 1 had sex with approximately eight men while working for DELANEY and Individual A during the week or two weeks before the ISP traffic stop.   Sometimes the men called Victim 1 directly, and sometimes they called DELANEY or Individual A, who referred the men to Victim 1.   DELANEY and Individual A had the men come to a parking lot next to the hotel, and DELANEY and Individual A evaluated the men to make sure the men were not police before sending the men to Victim 1's hotel room.

47.   On or about November 2, 2010 and on or about February 28, 2011, respectively, FBI agents conducted two interviews with Victim 1.   In those interviews, Victim 1 provided the following additional details and clarifications.   Victim 1 returned to Michigan after ISP troopers arrested DELANEY on or about September 29, 2010. Shortly thereafter, DELANEY called Victim 1.   DELANEY told Victim 1 that the FBI had contacted DELANEY and that Victim 1 should not talk to the FBI.[7]   Victim 1 stated that DELANEY asked Victim 1 to return to Chicago in order to do the same thing as before.   DELANEY also stated that he had another girl working for him.   Victim 1 told

---

[7] On or about October 5, 2010, FBI agents interviewed DELANEY at Will County Jail.   Among other things, DELANEY stated (1) that DELANEY went from hotel to hotel and traveled between Joliet, Illinois and Kalamazoo, Michigan; (2) that he knew Victim 1 and Individual B were from Michigan; (3) that Victim 1 and Individual B came from Michigan to hang out with DELANEY and Individual A; (4) that Victim 1's nickname was "CeCe"; and (5) that Victim 1 was younger than Individual B and that Individual B was Victim 1's sister.   DELANEY denied the he was engaged in sex trafficking.

DELANEY that Victim 1 would return to Chicago, but she did not return to Chicago. Sprint records showed a telephone call on October 23, 2010 from the number ending in "6680," subscribed to DELANEY, to the home telephone number of Victim 1's mother and an almost 50 minute call from the home telephone number of Victim 1's to the number ending in "6680" later that day. Subsequently, there are approximately 22 telephone calls from the number ending in "6680" to the home telephone number of Victim 1's mother from approximately October 25, 2010 to November 9, 2010, all between 0 and 7 seconds in duration.

## III.   DELANEY's Continued Sex Trafficking of Victim 1

48.    FBI agents located several advertisements for commercial sex acts on backpage.com and other websites, with posting dates ranging from approximately December 2010 to at least approximately June 2011, advertising a female under the name "Brazil," and listing a telephone number ending in "0159." Telephone records showed that the telephone number ending in "0159" was subscribed to DELANEY during this time period (hereinafter "DELANEY Phone 1"). The location listed was for Kalamazoo/Battle Creek, Michigan. Backpage.com records showed the user posting certain of advertisements for "Brazil" had listed in the lines for name, address, and city "fuck the feds." In addition, the user in at least one advertisement for "Brazil," with DELANEY Phone 1 listed as the telephone number and his name as "fabrieal delaney." The photographs of the female did not show her face, but based on FBI agents' familiarity with Victim 1, FBI agents believe that certain of the photographs could be Victim 1.

24

49.    On or about March 18, 2011, Battle Creek Police officers arrested DELANEY for retail fraud after shoplifting a bottle of orange juice. According to the police report, DELANEY previously had been at the same store stealing items with a female. The police report stated that DELANEY told officers the first name of the female was Victim 1's first name, but claimed not to know the female's last name.

50.    On or about July 7, 2011, an FBI agent received a text message from Victim 1's mother that read, "[Victim 1] is livin with Face in kzoo."

51.    On July 18, 2011, Chief Judge James F. Holderman for the Northern District of Illinois authorized the obtaining of a pen register and trap and trace device, and historical and prospective cellular location information for DELANEY Phone 1.

52.    On or about July 21, 2011, law enforcement agents met Individual A at the Cook County Probation Office. Individual A waived her *Miranda* rights orally and in writing provided the following information.

a.    Individual A met DELANEY approximately four years ago, when she was approximately 17. DELANEY had previously engaged in the sex trafficking of Individual A. In approximately August 2010, DELANEY again began sex trafficking Individual A. DELANEY posted internet advertisements for commercial sex acts with Individual A during that time period. As a result of these advertisements, DELANEY and Individual A received calls from clients for Individual A regarding commercial sex acts and Individual A engaged in commercial sex acts with multiple clients a day. DELANEY

25

regularly physically beat Individual A in the course of their relationship and when she did not want to engage in commercial sex acts because, for example, she was not feeling well.[8]

      b.     DELANEY told Individual A that he sent messages to girls to recruit them to work for Blue Flame Entertainment through his Tagged.com profile and Victim 1 responded. Blue Flame Entertainment was what DELANEY and Individual A called their prostitution business.

      c.     In approximately mid to late fall 2010, when Individual A was 20 years old, Individual A became tired and no longer wanted to engage in commercial sex. In response, DELANEY suggested that DELANEY and Individual A pick up Victim 1 from Michigan and return with Victim 1 to Joliet, Illinois for purposes of sex trafficking Victim 1. DELANEY told Individual A that Victim 1 was 17, but that she would turn 18 soon. Individual A eventually agreed.

      d.     Individual A and DELANEY drove to Michigan and returned to Joliet, Illinois, with Victim 1. Originally, Individual A had wanted to wait until Victim 1 turned 18, but DELANEY and Individual A began "working" Victim 1 the next day. "Working" meant "prostituting." After arriving in Joliet, Illinois, during an approximately two to three week period, Victim 1 received calls from internet advertisements posted on backpage.com and other websites and engaged in sexual acts for money with approximately 5 to 6 client approximately each day.  . DELANEY was the one with the

---

[8] In an interview with FBI agents, another witness who was sex trafficked by DELANEY confirmed that she saw DELANEY physically beat Individual A.

idea to include the ethnicity of Victim 1 and Individual A and include asking about the "2 girl show" in the advertisements.

        e.     Before the September 29, 2010, ISP traffic stop, DELANEY, Individual A, and Victim 1 returned to Michigan for about two days. DELANEY and Individual A sex trafficked Victim 1 in Michigan, but Victim 1 received only about one call a day for commercial sex acts. As a result, DELANEY, Individual A, and Victim 1 returned to Joliet, Illinois to continue sex trafficking Victim 1.

        f.     Individual A no longer wanted to engage in commercial sex acts, and so DELANEY and Individual A decided to begin sex trafficking Individual B, in addition to Victim 1. DELANEY and Individual A asked Individual B to come from Michigan to Joliet, Illinois for purposes of sex trafficking. On or about September 29, 2010, before the ISP traffic stop, DELANEY, Individual A, and Victim 1 picked up Individual B from the Greyhound bus station.

        g.     After the ISP traffic stop, while at the police station, a police officer asked Individual A in front of Victim 1 whether Individual A knew that Victim 1 was 16. Victim 1 denied being 16 and promised Individual A that Victim 1 was 17.

        h.     Individual A identified DELANEY, Victim 1, and herself in several photographs taken at a hot tub and pool with the white and blue checkered background. If DELANEY was not in the photograph with Individual A and/or Victim 1, then DELANEY took the photographs of Individual A and/or Victim 1.

27

53.    On or about July 21, 2011, at the direction and in the presence of law enforcement agents, Individual A participated in consensually recorded telephone calls to DELANEY and Victim 1.    The following are partial summaries of certain of the consensually recorded calls between Individual A and DELANEY and Individual A and Victim 1.    All consensually recorded calls placed by Individual A were made at the direction of law enforcement.    All the consensually recorded calls occurred in the presence of law enforcement.    For some of the calls summarized below, I have placed in brackets my understanding of what is being said during recorded calls, based on the content and context of the conversations, the history of the investigation, my experience as a law enforcement officer and the experience of other law enforcement officers in this investigation, and debriefings with Individual A.    The times of the recordings are approximate.    Law enforcement identified the voices on the consensual recordings from their interviews with DELANEY and Victim 1 and from debriefings with Individual A.

54.    On or about July 21, 2011, at approximately 11:13 a.m., Individual A placed a consensually recorded call to DELANEY.    DELANEY answered.    Individual A told DELANEY that, "Uh shit nothing I was trying to see what's up like I really need your help."    Individual A explained that, "Because um one of my old tricks is having a bachelor party tonight and he needs me to come through but he wants specific girls, like he wants exotic looking girls."    Individual A told DELANEY the client's name was "Byron" and provided DELANEY with the location for the bachelor party of Tinley Park.    DELANEY asked Individual A, "Mm, why the fuck you call me on the day, the day you trying to get

28

up." Individual A responded, "Because it's not 'til nighttime but y'all need to have everything in order before that. And the only other person who I could think of that looks Hawaiian is Shorty." [I believe "Shorty" referred to Victim 1.] DELANEY confirmed, "Yeah, she definitely does." Individual A also stated that the location was a Holiday Inn in Tinley Park, Illinois. Individual A stated, "You just think you mister magic pimp or something nowadays I see." To which, DELANEY replied, "Mmmm, I wouldn't say nowadays. My managing skills better than those niggers." Individual A stated, "It doesn't matter, you're with CeCe now so it's whatever. I'm . . . this about money so let's keep it about money." [I believe "CeCe" is a nickname for Victim.] DELANEY agreed, stating, "For sho."

55. DELANEY called back Individual A in a consensually recorded call at approximately 11:30 a.m. In the telephone call, Individual A asked DELANEY to send photographs of the girls he was thinking about bringing. Later in the day at approximately 2:17 p.m., DELANEY sent from his telephone two photographs of two females to Individual A. Individual A stated that one photograph was labeled "Brazil," which Individual A recognized as Victim 1, and one photograph was labeled "sydneylove."

56. At approximately 11:47 a.m., DELANEY called Individual A from Victim 1's telephone number. DELANEY confirmed that he had three females, Victim 1, Individual B (Victim 1's sister), and a "white girl".

57. In a later call with Victim 1 at approximately 12:36 p.m.,Victim 1 stated Individual A to tell the client that Victim 1 "want to speak with you and make sure it's for

29

sure before she drives all the way down there." Individual A asked, "Does uh Face know that you gonna to talk to him already 'cause I don't want him to try to snap on me or anything about nothing." Victim 1 confirmed that "yeah, that's what he told you." Individual A told Victim 1 that the client was "getting the condoms and everything now, so ya'll don't have to worry about condom or nothing." Individual A further stated that, "A couple of them for sure, I know a couple of them want to fuck. I know that um his friend who got the room, his name is James or whatever, he wants to have a threesome. . . I told him you and your sister were Hawaiian so stick with that."

58. In a telephone call at approximately 2:30 p.m., Individual A told DELANEY that, "it is going to be like 12 tricks, 10-10 to 12 tricks." Individual A told DELANEY, ". . . The real money is gonna come in...When I-when I have sex with him, with Byron[the client], he gives me the least amount of 300, so just imagine, if it's 10 to 12 guys, it's only four of us girls, how many, how much money we're going to make." Individual A further stated, "For a blow job, when I, like I met his friend, the guy who got the room for him or whatever, and he um, basically when I met with him, I only gave him a blow job and he gave me 150. Every time I meet up with Byron, he gives me 300 and he nuts in like two minutes." DELANEY responded, "Okay, well look, um each one of them . . . is going to be paying it." Individual A stated, "That's what I'm saying. Everyone of them wants to have sex or a blow job, so it's going to be 150 every man or 300 every man."

59. In a call at approximately 3:01 p.m., Individual A told DELANEY that the client wished to speak to one of the girls. DELANEY handed the telephone to Victim 1

30

and Individual A asked Victim 1 if Victim 1 was ready to talk to the client. Individual A handed the telephone to an undercover officer ("UC"). The UC told Victim 1 that "a lot of my friends want sex, I am going to be honest. Is that okay?" Victim 1 stated that "that would be fine. No problem." Several minutes later, Victim 1 and the UC handed the telephones back to DELANEY and Individual A, respectively.

60.    -At approximately 3:48 p.m., Individual A called DELANEY. Individual A told DELANEY that, "A lot of the guys wants something exotic, so maybe CeCe and her sister can deal with those guys." Individual A stated that, "it is $150 for head and $300 for pussy.

61.    Sprint records provided cellular location information regarding DELANEY Phone 1 on or about July 21, 2011. At approximately 8:41 p.m., records showed a cell site location for DELANEY Phone 1 in the area of Kalamazoo, Michigan. At approximately 8:15 p.m., Individual A called DELANEY on DELANEY Phone 1. DELANEY told Individual A that he had to pick up Victim 1's sister, Individual B and then they would be on their way. At approximately 9:31 p.m., Individual A called DELANEY Phone 1, and Victim 1 answered. Victim 1 told Individual A that they were on their way. Victim 1 handed the telephone to DELANEY. DELANEY told Individual A that he can get to Tinley Park around 11:00 p.m. At approximately 11:07 p.m., Individual A called DELANEY Phone 1

62.    At approximately 11:27 p.m., the location for DELANEY Phone 1 was in the area of Dolton, Illinois. At approximately 12:11 a.m., law enforcement agents observed a

31

blue Ford Explorer driving in parking lot of the Holiday Inn in Tinley Park, Illinois. A male, later identified as DELANEY, was driving the Explorer. At the direction of law enforcement, Individual A was waiting in a hotel room with law enforcement agents in the Holiday Inn.

63.     Around this time period, DELANEY called Individual A and told Individual A that he wanted to come up and see Individual A. Individual A stated that she would send a room key with Victim 1, after Victim 1 came up to the room. After parking the Explorer, three females left the Explorer and entered the lobby. Law enforcement agents later identified two of the females as Victim 1 and Individual B. Victim 2 identified herself to law enforcement agents. DELANEY left the Explorer and followed the three females into the hotel lobby. Shortly thereafter, DELANEY left the hotel and approached the Explorer, at which time law enforcement arrested DELANEY.

64.     Law enforcement agents recovered DELANEY Phone 1, identified through cellular location information and statements by Victim 1 and Victim 2, from DELANEY during his arrest at approximately 12:15 a.m. on or about July 22, 2011. After waiving orally and in writing his *Miranda* rights, DELANEY told law enforcement that Victim 1 and Victim 2 were both 17 and that Individual B was 18. DELANEY advised law enforcement that Victim 1 was pregnant with his child.

65.     Victim 2 provided the following information to law enforcement agents: Victim 2 was 16 years old. In approximately early July 2011, Victim 2 met DELANEY in Michigan, and he began sex trafficking her immediately. Since approximately early July

2011, Victim 2 went on approximately 20 to 24 calls for commercial sex, providing DELANEY with half of the money from the commercial sex acts. Victim 2 had come with DELANEY from Michigan.

66.     At approximately 1:45 a.m., I brought Victim 2 back into the hotel room with the other three females. At that time, after there were sufficient law enforcement agents available, law enforcement officers unhandcuffed Victim 1, Individual B, and Individual A. I took Victim 1 into the other hotel room. I began to orally advise Victim 1 of her Miranda rights. Victim 1 interrupted that she knew her rights and then recited to me the full Miranda rights. Law enforcement agents offered Victim 1 food and drink and eventually ate several cookies and water. Victim 1 provided the following information: Victim 1 was working for DELANEY again. When Victim 1 to DELANEY, he told that he had been coming to her hometown either to kill her or to force her to work for him. DELANEY took most of the money they made from calls. DELANEY choked Victim 1 for the first time today. DELANEY then told Victim 1 that she was lucky that DELANEY did not beat her like he beat Individual A. Victim 1 confirmed that DELANEY's number was DELANEY Phone 1. Victim 1 was pregnant with DELANEY's child.

## CONCLUSION

67.    Based on the above information, there is probable cause to believe that

FABRIEAL DELANEY, also known as "Face," knowingly transported Victim 1, an

individual who had not yet attained the age of 18 years, in interstate commerce, from the

State of Michigan to the State of Illinois, with the intent that the Victim 1 engage in

prostitution; in violation of Title 18, United States Code, Section 2423(a).


FURTHER AFFIANT SAYETH NOT.

Carrie Landau
Special Agent, FBI

Subscribed and sworn
before me this 22nd day of July, 2011

_____
Honorable Jeffrey Cole
United States Magistrate Judge

34